IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL WAYNE KING,

    Petitioner,

v.

BOB HOREL,

    Respondent
                                      /

No. C 06-2606 MMC (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is Paul Wayne King's ("King") petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Respondent Bob Horel has filed an answer and a memorandum of points and authorities in support of his answer, to which King has replied. Having read and considered the papers filed in support of and in opposition to the petition, the Court rules as follows.

**PROCEDURAL BACKGROUND**

A jury in San Mateo County Superior Court found King guilty of "involuntary manslaughter, battery with serious bodily injury committed because of the victim's race, and commission of battery in violation of the victim's civil rights," see People v. King, 2004 WL 1759202, *1 (Cal. App. 2004) (internal citations omitted),[1] and the trial court found

---

[1] Additionally, a "great bodily injury allegation regarding the civil rights violation count was found by the jury to be not true." See id. at *1 n. 3 (internal citation omitted).

1 allegations as to prior convictions to be true, see id. at *14-15.  On August 26, 2002, the
2 trial court sentenced King to a term of 46 years to life in prison.  See id. at *1 n. 3; Resp't's
3 Ex. 1 at 384-87.  King thereafter filed an appeal.  See id. at *1.

On August 6, 2004, the California Court of Appeal reversed as to the sentence only.
See id. at *15.  In particular, the Court of Appeal struck three one-year enhancements
based on "prison priors," and remanded for retrial on the issue of whether one of King's
prior convictions was a "serious felony."  See id.  In all other respects, the judgment was
affirmed.  See id.  On July 14, 2004, the California Supreme Court denied King's request
for review.  (See Petition ¶ 6.)  On remand, a jury trial was conducted, and the jury found
true the allegation that one of the prior convictions was a "serious felony"; the trial court
subsequently sentenced King to a term of 42 years to life.  (See id. ¶ 7.)

## FACTUAL BACKGROUND[2]

### A. Prosecution Case

Amber Rivas ("Rivas") testified that at about 6:00 p.m. on December 11, 1999, when she showed up for work as a bartender at the Shooter's Bar ("Bar") in Redwood City, King, whom Rivas did not know, was inside drinking beer.  At about 6:15 p.m., King helped the band playing at the Bar carry their equipment inside.  Between 6:45 and 7:00 p.m., two "White" women, later identified as Lisa Lesley ("Lesley") and Kari Dorstad ("Dorstad"), and a "Black" man, later identified as the victim, Brad Davis ("Davis"), entered the Bar together. While the two women went to the restroom, Davis approached the bar, ordered drinks for the women and orange juice for himself.  King was seated near the bar.  The two women returned, sat down next to Davis and started talking with him.  King said, "I can't believe Tony lets this go on in his Bar."[3]  When Rivas asked King what he meant, he repeated the same statement and "nudged his head towards the middle of the Bar" where Davis and the

---

[2]The following factual background is derived from the opinion of the California Court of Appeal.

[3]Antonio "Tony" Reyes was the Bar's assistant manager on the night of Davis's death.

two women were seated. King then got up, flexed his muscles in the mirror, sat down next to Davis and started talking with him. To Rivas, the conversation appeared to be "normal" and "casual." Five minutes later, King and Davis left the Bar by the back door. Minutes later, King "very quickly" re-entered and walked through the Bar alone. When Rivas asked King if he was leaving, King said, "I got to go," and then quickly "grabbed his stuff off the bar and went out the door." As King was leaving, "Gary," a Bar patron and band member, told Rivas, "I have a man down in back." Rivas went outside and saw Davis lying on the ground on his back with both hands in his pockets. Rivas returned to the Bar and called 911. On cross-examination, Rivas said it was "possible" that she originally believed King's comment, "I can't believe that Tony lets that go on here," referred to a drug transaction. She saw no drug activity in the Bar, however.

According to Lesley, when she, Dorstad, and Davis arrived at the Bar, there were about 10 to 15 "mostly White" people there. Other than Davis, there were no African Americans in the Bar. There did not appear to be any problem or animosity between Davis and King while they sat talking. When Davis got up, he said he was going out back to smoke a cigarette. Davis and King walked together to the back of the Bar. A couple of minutes later, Lesley saw King running through the Bar and out the front door, and heard someone yell, "Your boyfriend is down." Lesley went outside and saw Davis lying on the ground, not moving, with his hands in his pockets. A small amount of blood was coming out of the right side of Davis's mouth.

Band member Terryl Graves ("Graves") testified that 10 or 15 minutes after King had helped unload equipment from Graves's truck, Graves and Shelly Turner ("Turner") were outside in back of the Bar stowing the ropes used to secure the equipment. Four or five minutes later, King and Davis came out of the Bar in a "very low key" manner. King said to Davis, "We have to talk." Graves turned away and busied himself with his ropes and truck. At some point Graves heard a "popping sound," turned around, yelled "Hey," and saw Davis on the ground on his back and King standing next to him. King stood there momentarily and stepped across Davis and walked into the Bar. Graves entered the Bar

3

1 and asked someone to call an ambulance.  Prior to hearing the popping sound, Graves
2 heard no altercation.

3 Turner testified that, while King was at the bar, King loudly told everyone he had just
4 been released from prison.  Turner bought King a drink in exchange for his help unloading
5 the truck and went outside to help Graves.  While outside, Turner heard voices, turned
6 around, and saw King and Davis talking.  Davis's hands were in his pockets.  Turner turned
7 back to talk to Graves.  Turner heard a sound after which Graves said, "Hey man."  Turner
8 turned around and saw Davis lying on the ground with his hands in his pockets and King
9 quickly enter the Bar.

10 Sean McManus ("McManus"), an "acquaintance" of King's for more than 10 years,
11 was at the Bar on the night of Davis's killing.  McManus, who claimed to have memory
12 problems due to drug use, said that while seated at the bar talking to King, he noticed
13 Davis, Lesley, and Dorstad.  Later, while McManus was talking on the Bar's pay phone, he
14 saw Davis fall, hit his head and defecate on himself.  McManus then quickly left the Bar.

15 Davis was transported to the hospital, never regained consciousness, and died six
16 days later.  Forensic pathologist Peter Benson, M.D. ("Dr. Benson") performed the autopsy
17 on Davis.  Dr. Benson opined that Davis suffered blunt head trauma to the back of his
18 head, resulting in skull fractures and a "contrecoup injury" to the brain.  The cause of death
19 was craniocerebral injuries due to blunt head trauma.  Dr. Benson stated that a person who
20 was pushed and fell backward, hitting the back of his head, could "very well" sustain a
21 contrecoup-type injury.  Davis also sustained injuries to his left lower lip and cheek area,
22 which could have resulted from being punched.  Dr. Benson said a contrecoup injury is less
23 likely to occur from a person merely collapsing and falling straight down and hitting his
24 head, and Dr. Benson found no factors that would have caused Davis to collapse.  Blood
25 tests performed on Davis upon admission to the hospital were negative for illegal drugs.

26 On January 31, 2000, Redwood City Police Detective Garcia ("Garcia") questioned
27 McManus about the Davis killing.  McManus said that when "the Black man" walked into the
28 Bar with "two Caucasian women," King gave "the Black man dirty looks."  McManus also

4

said that King stood in front of the Bar's mirror, simultaneously flexed both his biceps while looking at Davis and said, "I am getting big." McManus said there was "some tension" during the exchange, so when King sat down at the bar, McManus told him, "Don't go there"; King then went over to talk to Davis and they went outside.

Michael Anderson ("Anderson"), in custody for domestic violence, testified he had known King for 10 years and that, on two occasions, King had talked with him about the incident at the Bar. On the first occasion, King told him, "A nigger came into the Bar and he was with a White girl and I just couldn't deal with that." King said they "had words with each other" and were staring at each other and then went "out back." King told Anderson he "hit the nigger one time. [Davis] went down, and that was the end of it." King said he hit Davis "because he didn't like the fact that he was with a White girl." King was bragging about the incident because he thought he was "going to get away with it." On the second occasion, King repeated this information and added that he was facing charges resulting from the incident. Instead of bragging, King was concerned that he was "in trouble for it." Anderson confirmed he was deriving no benefit by testifying. Anderson also testified that after he had given a statement to law enforcement, King told him he was a "piece of shit" and that King was "going to get [him]." On cross-examination, Anderson admitted to multiple prior felony convictions. Anderson also testified that the first conversation he had with King about the incident occurred in 2000 when they were in adjoining cells at San Quentin State Prison, and that he then gave the information to law enforcement in an attempt to have his parole transferred.

San Mateo County Deputy Sheriff Santiago testified that, three days after the incident, King told him that King's "SWP" tattoo stood for "Supreme White Power."

Sergeant Woodford ("Woodford"), who works at San Quentin, testified as an expert in the "recognition, identification and ideology of White supremacist groups." Woodford testified that White supremacist groups such as the Aryan Brotherhood, Skin Heads, Ku Klux Klan, Heritage Front, and Aryan Nation, "pretty much have standing orders to assault, slash, kill" African Americans, "and that is the No. 1 trophy. . . . If you can kill a Black, it

5

gives you status in that organization." Woodford, who had examined the tattoos on King's body, testified that the tattoo of "aces and eights" playing cards is used by the Aryan Brotherhood to identify members, and that the "88" tattoo is used by many White supremacists and skinheads and means "Heil Hitler." He also testified that the "88" tattoo would lead him to believe that an individual is or was "affiliated" with White supremacist-type gangs, and that the lightening bolt tattoo, symbolic of "Nazi Germany's SS," is used by skinheads and other White supremacists. Woodford testified that the swastika tattoo is often used by persons who have White supremacist or neo-Nazi ideologies, and that the "SWP" tattoo signifies "Supreme White Power." Woodford further testified that one of the eagles tattooed on King's chest was a "war bird" taken from the "iron eagle of Nazi Germany," and that the eagle's tail, swastika and ribbons together form an "A" for "Aryan." Woodford opined that an individual with tattoos such as King's would be affiliated with White supremacist groups.

On cross-examination, Woodford clarified that in his opinion King is "clearly" an "associate" of the Aryan Brotherhood, a White supremacist organization. Woodford testified that King could also be an associate of other groups such as the Ku Klux Klan. Woodford testified that an "associate" is someone striving for membership in such a group. Woodford stated that, inside the prison system, associates are trying to do work for the Aryan Brotherhood such as narcotics trafficking. He further testified that orders regarding various acts of violence come from within the prisons, and there are also "standing orders" to Aryan Brotherhood associates or members that if "you kill a [B]lack, more power to you." Woodford conceded he had no evidence that King had been issued an order of any kind; he assumed King had been in and out of San Quentin over the years, but had no evidence that King was ever involved in doing any work, favors or errands for the Aryan Brotherhood. Woodford conceded that his opinion of King's association with the Aryan Brotherhood was based solely on King's tattoos. Woodford testified that he first identified King as an associate of the Aryan Brotherhood in August 2001, when the instant case was brought to his attention. He also testified that, in his opinion, everyone who has a tattoo of a swastika

6

or lightning bolt is a White supremacist.

**B. Defense Case**

The thrust of the defense was that King committed no offense against Davis, that he had nothing to do with Davis falling to the ground, and that the evidence regarding his tattoos served only to inflame and prejudice the jury against him.

Tattoo artist Lyle Tuttle ("Tuttle"), testifying as an expert in "tattoo art," testified that the "aces and eights" playing cards tattoo signifies the cards held by "Wild Bill Hickok," is called the "dead man's hand," and is a common and nondescript "filler tattoo." According to Tuttle, King's swastika, lightening bolt and eagle tattoos are often requested by people of a "motorcycle" orientation, and the wearing of swastika tattoos by "bikers" is a symbol of patriotism. On cross-examination, Tuttle conceded these symbols were used by White supremacist groups.

Lieutenant Williams ("Williams"), of the California Department of Corrections, testified that in 1997 and 1998 she was the commander of the low security, interracial "fire camp" where King was then housed. Williams was aware of King's tattoos but said she never observed him exhibit any hostility toward Black inmates.

Charles Pelz ("Pelz"), a private corrections consultant, testified as an expert on prison gangs. Pelz testified that, generally, associates of the Aryan Brotherhood do not carry out acts of violence for a gang. He further opined that King's bird and swastika tattoos were not indicia of membership or association in the Aryan Brotherhood. He conceded that "SWP" stands for "Supreme White Power" and that tattoos of swastikas and lightening bolts are symbols used by White supremacist gangs; he also stated that people with those tattoos and SWP tattoos would "gravitate" toward a White supremacist type of group.

## DISCUSSION

A district court may grant a petition challenging a state conviction on the basis of a claim reviewed in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

7

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d). "[I]t is the habeas applicant's burden to show that the state court applied [clearly established federal law] to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

King argues he is entitled to relief on three claims, which the Court considers in turn.[4]

**1. Testimony Re: Tattoos and Gang Association**

As noted, Woodford, the prosecution's expert witness, testified that, in his opinion, King was an "associate" of the Aryan Brotherhood; such opinion was based on the particular tattoos on King's body. He further testified that Aryan Brotherhood associates are under "standing orders" to kill African-Americans. (See Resp't's Ex. 2 Vol. 4 at 593-94.) King argues that Woodford's testimony "operated to convict [King] through guilt by association and failed to legitimately support any proper inference," and consequently, King asserts, admission thereof deprived King of due process. (See Petition ¶ 21.)

On direct appeal, King, citing McKinney v. Rees, 993 F. 2d 1378 (9th Cir. 1993), argued that "[t]he admission of character evidence when it is incapable of supporting any legitimate, permissible purpose, can violate due process"; King asserted that Woodford's testimony was not relevant for any permissible purpose. (See Resp't's Ex. 3 at 27.) In McKinney, the Ninth Circuit addressed whether certain "other acts" evidence was "relevant to a fact of consequence" or "relevant only insofar as it proves the character of the defendant in order to show conformity therewith," see McKinney, 993 F. 2d at 1380, and found the "other acts" evidence at issue therein was "probative only of character and, thus,

---

[4]In his petition, King alleged a fourth claim, specifically, that he was subjected to double jeopardy when, on remand, he was retried on the issue of whether he had a "serious felony" prior conviction. (See Petition at 6:26 - 7:3.) King has, however, "abandon[ed]" such claim. (See Petitioner's P. & A. in Support of Petition, filed September 25, 2006, at 8:26-27; 17:26-27.)

8

irrelevant"; consequently, there being "no permissible inferences" the jury could have drawn from the subject evidence, the Ninth Circuit further found defendant's due process rights were violated by its admission, see id. at 1384, 1386.

The California Court of Appeal rejected King's argument, finding the holding in McKinney "inapposite" because "the gang evidence was material to prove the hate crimes charged." See King, 2004 WL 1759202, at *7. Specifically, the California Court of Appeal, after characterizing the "gang evidence" as "other acts" evidence, held that the "significance of [King's] tattoos was definitely relevant to establishing his intent and motive at the time of the incident" and that "Woodford's testimony that [King's] tattoos depicted symbols used by White supremacist gangs, whose ideology embraced the hatred of African Americans, was clearly relevant to establishing that at the time of [the] battery, [King] possessed a similar racial motivation to commit the battery." See id. at *6.

Before this Court, King, as noted, argues that Woodford's testimony "failed to legitimately support any proper inference," (see Petition ¶ 21), seemingly challenging the Court of Appeal's determination that Woodford's testimony was relevant to the issue of whether the battery was motivated by racial bias. King fails to articulate, however, any reason for why such determination was in error, let alone show that such determination constituted a clearly unreasonable application of federal law as determined by the United States Supreme Court. For this reason alone, King's claim fails. See Woodford, 537 U.S. at 25 (holding petitioner has "burden to show that the state court applied [clearly established federal law] to the facts of his case in an objectively unreasonable manner").

Moreover, the jury was charged with determining, if it found King committed a battery, whether King did so "because of the victim's race." (See Resp't's Ex. 1 Vol. 1 at 290, 321.) The phrase "because of" has been interpreted by the California Supreme Court to mean that the defendant was "motivated by prohibited bias" and that such bias was a "cause in fact of the offense." See People v. Superior Court (Aishman), 10 Cal. 4th 735, 380-81 (1995) (interpreting "because of" requirement in former Cal. Penal Code

//

1  § 422.75).⁵ The California Court of Appeal did not unreasonably find that the subject
2  evidence, that King had tattoos indicative of a person associated with the Aryan
3  Brotherhood and that persons associated with the Aryan Brotherhood are under "standing
4  orders" to attack African-Americans, was relevant to the issue of whether King acted with
5  the requisite motivation.  See, e.g., United States v. Allen, 341 F. 3d 870, 885-6 (9th Cir.
6  2003) (holding, in context of prosecution for conspiracy to deprive racial minorities of equal
7  access to public park, "color photographs of [defendants'] tattoos (e.g., swastikas and other
8  symbols of white supremacy)" were relevant to prove "defendants' motive, intent, and
9  plan").

10  King also argues that he was deprived of due process because the trial court did not
11  give a limiting instruction, and that said omission prejudiced King because the jury likely
12  considered the evidence for the assertedly inadmissible purpose of determining whether
13  King committed a battery.  According to King, "the evidence was used to show the
14  commission of the corpus of the offense rather than merely the motive or state of mind with
15  which an act was done."  (See Petitioner's P. & A. in Support of Petition at 13:18-19.)

16  King's alternative theory likewise fails.  First, as King acknowledges, the United
17  States Supreme Court has yet to determinate whether admission of a defendant's prior
18  conduct, when offered to prove "propensity to commit a charged crime," violates the Due
19  Process Clause, see Estelle v. McGuire, 502 U.S. 62, 75 (1991) (noting, but "express[ing]
20  no opinion," on issue), and, consequently, King cannot identify any clearly established
21  federal law determined by the United States Supreme Court in support of the instant claim.
22  Second, the trial court indicated, prior to Woodford's testifying, that King would be entitled
23  to a limiting instruction, (see Resp't's Ex. 2 Vol. 3 at 465), and the record, as the Court of

---

⁵At the time of the offense and trial, § 422.75 provided for a sentence enhancement where "a person who commits a felony . . . because of the victim's race." See former Cal. Penal Code § 422.75.  As a result of statutory revisions enacted in 2004, § 422.75 now provides for a sentence enhancement where a person "commits a felony that is a hate crime," see Cal. Penal Code § 422.75(a); "hate crime" is defined as "a criminal act committed, in whole or in part, because of one or more [specified] actual or perceived characteristics of the victim," including "race," see Cal. Penal Code § 422.55 (a).

1 Appeal observed, contains no indication that King ever requested such limiting instruction,
2 see King, 2004 WL 1759202, at *5.  King fails to cite any clearly established federal law
3 requiring reversal of a conviction where the trial court indicated its willingness to give a
4 limiting instruction, yet the defendant thereafter failed to request one.  See, e.g., Murray v.
5 Superintendent, Kentucky State Penitentiary, 651 F. 2d 451, 454 (6th Cir. 1981) (citing
6 cases in which courts have "declined to reverse convictions . . . where evidence of prior
7 convictions or criminal acts entered the trial, but counsel made no request for a cautionary
8 instruction").

9     Accordingly, King has failed to show he is entitled to relief on this claim.

10 **2. Preliminary Jury Instruction**

11     After the jury was selected, and before the presentation of evidence began, the trial
12 court gave the following preliminary instruction:

> There will be testimony about places within this county.  The decedent's death resulted from a battery that took place in a bar called 'Shooter's Bar' in Redwood City.  Don't go into that bar during the pendency of this case.  Don't go to any place that's referred to and do your own investigation.

(See Resp't's Ex. 2 Vol. 1 at 176.)  Shortly thereafter, the trial court summarized for the jury the charges, including Count One:  "It [Count One] alleges on or about December 11th, 1999, Paul Wayne King did unlawfully kill a human being, to wit, Brad Davis, without malice, as a proximate result of the commission by said defendant of an unlawful act, to wit, battery . . . ."  (See id. at 177.)  King argues that, by stating "[t]he decedent's death resulted from a battery," the trial court "declared as a fact the truth of the charge, . . . when in fact the chief issue in dispute was whether or not the death had resulted from a battery or from an accidental fall."  (See Petition ¶ 22.)

    On direct appeal, King argued the subject instruction was a direction to the jury to find that King had committed a battery that resulted in Davis's death, and that such error was structural and, consequently, reversible per se.  Alternatively, King argued that if a showing of prejudice was required, prejudice was apparent from the court's directive that the jury find a fact against King, whereas the question of whether King committed a battery

1 was a "hotly disputed issue." (See Resp't's Ex. 3 at 33.)

2 The California Court of Appeal rejected King's argument, finding King "failed to establish that the [trial] court's comment directed a verdict." In that regard, the Court of Appeal cited the following three instructions, each of which was given at the conclusion of the evidence:

> You must determine what facts have been proved from the evidence received in the trial and not from any other source. A "fact" is something proved by the evidence or by stipulation. A stipulation is an agreement between attorneys regarding the facts.
>
> You must decide all questions of fact in this case from the evidence received in this trial and not from any other source.
>
> I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion.

See People v. King, 2004 WL 1759202, at *9. The Court of Appeal, citing state law providing that a jury is presumed to follow the trial court's instructions, held that "nothing in the record suggests that the jury in this case failed to do so." See id.

Before this Court, King argues that the California Court of Appeal's determination was erroneous, because the instructions on which it relied were given at the conclusion of evidence, as opposed to immediately after the preliminary instruction to which King objects. In support of this argument, King relies on Ninth Circuit cases that found no constitutional error where a trial court, after the close of evidence, expressly stated an opinion that a defendant was guilty of a charge, but then "made it clear to the jury that it was only a comment, that it was up to jury to come to its own conclusion, and that the jury was entirely at liberty to disregard the comment." See Davis v. Craven, 485 F. 2d 1138, 1139, 1142 (9th Cir. 1973) (en banc);[6] see also Gonsior v. Craven, 449 F. 2d 20, 21-23 (9th Cir. 1971)

---

[6]The trial court in Davis made the following statement at the close of evidence: "It is the opinion of this Court, based on the evidence that we heard in this case, that the guilt of the Defendant in this case has been proved beyond reasonable doubt as to each of the counts. I would caution you that it is your right and your duty to exercise the same independence of judgment in weighing the Judge's comments on the evidence as you are entitled to exercise in weighing the testimony of the witnesses and the arguments of

12

(same).

Assuming the Ninth Circuit cases on which King relies can be understood as implicitly holding that a trial court commits error where a trial court expresses an opinion that a defendant is guilty, and then does not "make it clear" the jury is free to disregard the trial court's opinion until a significant period of time has passed, King cites no Supreme Court decision so holding, expressly or implicitly. Consequently, King fails to cite any clearly established federal law as determined by the United States Supreme Court in support of the instant claim, and thus King is not entitled to relief thereon. See 28 U.S.C. § 2254(d)(1).

Additionally, as noted, in the Ninth Circuit cases on which King relies, the trial court expressly offered the opinion that the defendant was guilty of the offense charged. Here, the preliminary instruction at issue was not an expression of the trial court's opinion of King's guilt; rather, the comment was made in the context of a standard preliminary instruction advising jurors as to what the prosecution alleged, and directing the jury not to visit the site of an alleged crime.

Further, in addition to the instructions cited by the California Court of Appeal, the jury would not have reasonably understood the trial court to have stated prior to trial that, in fact, King had committed a battery that caused Davis's death, in light of the trial court's instructions to the jury, given both immediately after the preliminary instruction at issue and at the close of evidence, that one of the jury's tasks was to determine whether King had committed a battery. (See Resp't's Ex. 2 Vol. 1 at 177 (advising jury they would have to determine if King inflicted great bodily injury on Davis "if you find the defendant guilty of Count 1"); Resp't's Ex. 2 Vol. 5 at 803 (advising jury of elements prosecution must prove to establish battery occurred).) In addition, during their respective closing arguments, counsel

---

counsel. You will keep in mind that you are the exclusive judges of the credibility of the witnesses and of all questions of fact submitted to you. Such authority as the trial Judge has to express his personal thoughts on any of these matters is confined to the sole purpose of aiding you in arriving at a verdict and may not be used and is not to be used in this case to impose his will upon you or to compel a verdict." See id. at 1139.

1 for both the prosecution and the defense argued at length as to whether or not King had
2 committed a battery.  (See, e.g., Resp't's Ex. 2 Vol. 5 at 820-36, 875-80 (prosecution's
3 argument that circumstantial and direct evidence established King had punched Davis); id.
4 at 839-57, 872-74 (defense counsel's argument that evidence did not support finding
5 beyond reasonable doubt that Davis's injuries resulted from a punch).)  Indeed, argument
6 as to such issue comprised the majority of the time spent by each side in closing, certainly
7 signaling to any reasonable juror that the issue of battery was a matter of dispute for the
8 jury to decide.  Finally, the length of the jury's deliberations further demonstrates that the
9 jury did not understand the instruction at issue as a statement that King had, in fact,
10 committed a battery that caused Davis's death.  The jury did not reach a verdict quickly,
11 but, rather, deliberated for two and a half hours the first day of deliberations, (see Resp't's
12 Ex. 1 Vol. 1 at 349), the entirety of the second day of deliberations, (see id. at 351-52), and
13 one and a half hours on the third and last day of deliberations, (see id. at 352).
14 　　　　　Accordingly, King has failed to show he is entitled to relief on this claim.
15 　　　　　**3.  Opening Statement**
16 　　　　　During opening statement, the prosecutor stated that Rivas, the bartender, would
17 testify that when petitioner was leaving the Bar, she heard someone say, "That guy just
18 knocked that guy out."  (See Resp't's Ex. 2 Vol. 2 at 196.)  Thereafter, Rivas did not so
19 testify; rather, she testified that when petitioner was leaving the Bar, she heard a man say,
20 "I have a man down in back."  (See Resp't's Ex. 2 Vol. 3 at 385).  When asked if the man
21 said anything else, Rivas testified, "It's possible, but I don't remember."  (See id.)  Rivas
22 then testified that she had spoken to detectives the day after the incident, and when asked
23 if she remembered telling one of the detectives at that time that she heard someone say,
24 as King left the Bar, "That person just knocked that guy out," Rivas replied, "It's possible,
25 but I don't remember at this time."  (See id. at 386.)
26 　　　　　On direct appeal, King, argued that the prosecutor engaged in "prejudicial
27 misconduct" when "the prosecutor placed before the jury in his opening statement a
28 significant piece of evidence directly addressing his worst problem, namely, the lack of any

witness to the alleged battery – but then he did not actually have any such evidence." (See Resp't's Ex. 3 at 38.)

The California Court of Appeal rejected King's argument, finding there was no misconduct because there was no showing the prosecutor could not prove or did not intend to prove that Rivas heard the statement referenced in the opening statement. In particular, the Court of Appeal found the prosecutor's "statement [was] supported by Rivas's testimony that she might have told police that someone said 'that person just knocked that guy out.'" See People v. King, 2004 WL 1759202, at *11. Further, the Court of Appeal found that "any harm was sufficiently mitigated by the court's jury instructions that a fact is something proved by the evidence (CALJIC No. 1.00), and statements made by the attorneys during trial are not evidence (CALJIC No. 1.02)." See id.

Before this Court, King argues that the California Court of Appeal's finding constituted an unreasonable application of Frazier v. Cupp, 394 U.S. 731 (1969), wherein the United States Supreme Court stated: "It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." See id. at 736.[7]

In Frazier, the prosecutor's opening statement included a summary of testimony he anticipated would be given by a witness who had been indicted for murder along with the petitioner and had pleaded guilty to the charge. See Frazier, 394 U.S. at 733. At trial, the subject witness asserted his privilege against self-incrimination and did not testify. See id. at 734. The Supreme Court found the petitioner had failed to demonstrate the prosecutor's opening statement constituted misconduct, finding the evidence in the record supported the state court's determination that the prosecutor could have "reasonably expect[ed] [the witness] to testify in line with his previous statements." See id. at 736-37. The Supreme Court also found no violation of the Confrontation Clause, given that the trial court had given a limiting instruction advising the jurors that they "must not regard any statement

---

[7]In connection with such observation, the Supreme Court provided no examples.

made by counsel . . . concerning the facts of [the] case as evidence." See id. at 734-35.

Here, the Court of Appeal's determination that the prosecutor reasonably expected Rivas to testify in the manner described in his opening statement was neither an unreasonable application of clearly established federal law nor an unreasonable application of the facts presented. The record demonstrates the prosecutor intended to elicit the referenced testimony from Rivas, as evidenced by his attempt, albeit unsuccessful, to refresh her memory as to what she had told the investigating officers shortly after Davis's death. Finally, the trial court gave a limiting instruction in substantially the same form as that approved by the Supreme Court in Frazier. See id. at 736 (holding "[c]ertainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given").

Accordingly, King has failed to show he is entitled to relief on this claim.

**CONCLUSION**

For the reasons set forth above, the petition for a writ of habeas corpus is hereby DENIED.

**IT IS SO ORDERED.**

Dated: November 17, 2008

MAXINE M. CHESNEY
United States District Judge